## STROUSE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3278.

Circuit Court of Appeals, Fourth Circuit.

June 13, 1932.

Malcolm H. Lauchheimer, of Baltimore, Md. (Sylvan Hayes Lauchheimer, of Baltimore, Md., on the brief), for petitioner.

John H. McEvers, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Carlton Fox, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and R. W. Wilson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER, and SOPER, Circuit Judges, and WAY, District Judge.

SOPER, Circuit Judge.

Eli Strouse, the petitioner in this case, is endeavoring to take advantage of those provisions of the Revenue Acts whereby a net loss for any taxable year, resulting from the operation of a trade or business regularly carried on by a taxpayer, is allowed as a deduction in computing the net income of the taxpayer for the succeeding taxable year. See Revenue Act of 1921, § 204(a), 42 Stat. 227, 231; Revenue Act of 1924, § 206(b), (f), 43 Stat. 253, 26 USCA § 937(b), (f), and note. In 1923 the petitioner sustained a substantial loss upon the final disposition of certain shares of preferred stock of Strouse Bros., Inc., and the question is whether this loss was deductible from his net income for 1924 as one incurred in the manner described in the statutes.

The taxpayer had been a member of the partnership of Strouse & Bros., which had been organized by his father and uncles, and had successfully conducted a wholesale clothing business in Baltimore from 1865 to 1917. In the latter year, a corporation, Strouse Bros., Inc., was formed, and the business of the partnership was transferred to it. When this change took place, the estate of Isaac Strouse, the taxpayer's father, still had an interest, and Benjamin Strouse, an uncle, was still a partner in the firm. The combined capital of these two interests amounted to approximately $525,000, and it was essential to the successful operation of the business

by the new corporation that this sum be invested in its stock; but these interests were unwilling to make an unconditional subscription to the capital stock. Accordingly, an agreement was made on January 8, 1917, between the trustees of the estate of Isaac Strouse and the partners in the firm, including the taxpayer, which recited that the corporation had taken over the business of the firm. The trustees agreed to accept 1,000 shares of preferred stock of the corporation in full payment of $100,000 of the indebtedness due the estate, and consented that the balance of the indebtedness, amounting to $58,721.76 should be assumed by the corporation, upon the condition that the corporation would retire at least $30,000 of the stock in each year until it was all retired, and thereafter would pay the indebtedness at the same rate. The partners on their part guaranteed that the redemption of the stock and the payment of the debt by the corporation would be carried out. A similar agreement was made between Benjamin Strouse and the remaining copartners, including the taxpayer, with reference to the redemption by the corporation at the rate of $30,000 per year of 3,678 shares of the preferred stock accepted by Benjamin Strouse in payment of his interest in the partnership.

Eli Strouse, the taxpayer, received 1,536 shares of preferred stock for his interest in the firm, and later acquired 52 additional shares for $4,472, making the total cost of his investment in the preferred stock $158,072. He became the president of the new corporation at an annual salary of $15,000. The business did not prove to be as successful as had been hoped, and the corporation was unable, after a payment in January, 1919, to make additional redemptions of its preferred stock. It commenced to liquidate its assets in the year 1921. The trustees of Isaac Strouse still held 400 shares and Benjamin Strouse 2,778 shares of the preferred stock, which they had acquired in accordance with the agreements of 1917. The other parties thereto, in order to comply with their obligations, entered into a new agreement on October 8, 1922, whereby they agreed to turn over all the preferred stock which they owned to the trustees of Isaac Strouse and to Benjamin Strouse; and the taxpayer delivered his 1,588 shares on January 25, 1923. It is admitted that thereby he sustained a loss of $135,797.96 in the year 1923. Some question is raised as to whether this loss was caused by a depreciation in the value of the stock, or by the transfer of a valuable asset in compliance with the terms of the agreement of

guaranty. We shall assume, for the purpose of this decision, as seems to have been done by the Board of Tax Appeals, that the taxpayer suffered a net loss by the transfer of the stock in a substantial amount in excess of his net income for the year 1923, that would have been deductible in the succeeding year if the transactions under discussion are covered by the Revenue Acts referred to.

It is clear from this recital that, when the loss occurred in 1923, the taxpayer was not carrying on the business of the partnership, for this business had been transferred to the corporation when the guaranty was given. It has been held that it is sufficient, to bring a case within the sections of the statutes in question, that the loss result from the operation of a regular trade or business, whether the taxpayer was engaged in that business when the loss occurred or not. Marston v. Commissioner, 18 B. T. A. 558, 561, affirmed by the Court of Appeals of the District of Columbia on March 14, 1932. 57 F.(2d) 611. Prentice-Hall Federal Tax Service, 1932, vol. 1, 1057. See, also, Hines v. Commissioner (C. C. A. 7th) 58 F.(2d) 29. We need not consider this aspect of the case, but shall confine ourselves to the question whether the guaranty was given in the course of the operation of a trade or business regularly carried on by the taxpayer. He emphasizes the facts that, when the agreements of 1917 were made, he had no other business than his share in the partnership with which he had been actively associated as an employee and partner since 1889; that he was personally interested in the transfer to the corporation, because his capital in the firm would have been jeopardized by a liquidation, and because he was made president of the new company at a substantial salary; and that the new enterprise could not have been launched without the agreements of guaranty. He contends that he entered into the transaction, while a member of the partnership, in order to prevent the liquidation of the partnership and to permit the business to continue. Speaking broadly, these assertions are not without foundation; but it cannot be said in a true sense that his personal contract of guaranty was an act performed by him in the operation of the business of the partnership, the only business which he was carrying on before the contracts were made, or that it was an act performed by him as president of the corporation, the only activity in which he was engaged for some years thereafter. The contracts were signed, not as a partner, but as an individual, to put a successful end to the partnership, and to secure for the corpo-

ration the means necessary to carry on what had become the corporation's business. In short, the transaction was not effected in the course of any regular business carried on by the taxpayer; but it was a personal, isolated, disconnected act, such as the decisions uniformly hold to be outside the provisions of the statutes. Goldberg v. Commissioner, 59 App. D. C. 147, 36 F.(2d) 551; Pabst v. Lucas, 59 App. D. C. 154, 36 F.(2d) 614; Anderson v. U. S. (C. C. A.) 48 F.(2d) 201; Dalton v. Bowers (C. C. A.) 56 F.(2d) 16; compare Washburn v. Commissioner (C. C. A.) 51 F.(2d) 949.

The decision of the Board of Tax Appeals is affirmed.